IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA

ANGELA HARRY, ET AL,

      Plaintiff,

vs.

TIM GAINOUS, Individually, and
in his official/representative
capacity as Jail Administrator,
Sheriff's Department of Grady
County, Georgia

      Defendants.

CIVIL ACTION FILE NUMBER:
1:10-CV-130 WLS

COPY

| | |
|---|---|
| DEPOSITION OF: | TIMOTHY MALCOMB GAINOUS |
| TAKEN AT THE INSTANCE: | The Plaintiff |
| DATE: | July 12, 2012 |
| TIME: | Commenced at 11:17 p.m.<br>Concluded at 2:06 p.m. |
| LOCATION: | Grady County Courthouse<br>Cairo, Georgia |
| REPORTED BY: | PATRICIA MURPHY BREWER<br>Georgia Certified Court Reporter |

PATRICIA MURPHY BREWER, COURT REPORTER
POST OFFICE BOX 15171
TALLAHASSEE, FLORIDA  32317
(850)  878-6259

## APPEARANCES

REPRESENTING THE PLAINTIFF:

        GILBERT J. MURRAH, ATTORNEY AT LAW
        Law Office of Gilbert Murrah, P.C.
        Post Office Box 1421
        Bainbridge, Georgia   39818-1421


          - and -

        ROGER J. DODD, ATTORNEY AT LAW
        Dodd & Burnham, P.C.
        Post Office Box 1066
        Valdosta, Georgia   31601-1066

REPRESENTING THE DEFENDANTS:

        JASON WAYMIRE, ATTORNEY AT LAW
        Williams, Morris & Waymire, LLC
        4330 S. Lee Street NE, Bldg. 400-A
        Buford, Georgia   30518


ALSO PRESENT:

        TIM GAINOUS

        MAX KELLY

<u>INDEX</u>

| ITEM: | PAGE: |
|---|---|
| STIPULATIONS | 4 |
| CERTIFICATE OF OATH | 66 |
| CERTIFICATE OF REPORTER | 67 |

WITNESS:

TIMOTHY MALCOMB GAINOUS

    Direct Examination By Mr. Dodd      4

## STIPULATIONS

The following deposition of TIMOTHY MALCOMB GAINOUS was taken on oral examination, pursuant to notice, for purposes of discovery under the Federal Rules of Civil Procedure, as well as for all lawful purposes under the laws of the State of Georgia. All formalities are waived. All objections are reserved until such time as the deposition is used, except as to the form of the question and the responsiveness of the answer.

Reading and signing by the witness are not waived.

\*       \*       \*

## TIMOTHY MALCOMB GAINOUS

was called as a witness, and having previously been duly sworn, was examined and testified as follows:

## DIRECT EXAMINATION

BY MR. DODD:

    Q    Sir, I think you have already been sworn?

    A    Yes.

    Q    If you will, give me your full name, please.

    A    Timothy Malcomb Gainous.

    Q    And have you gone by any other name before?

    A    No, sir.

    Q    How long have you worked in the sheriff's office?

    A    Under my capacity now, since January 1st, 2005.

1          MR. WAYMIRE:  Just to be clear, did you work for
2      the sheriff's office before that?
3          THE WITNESS:  Before that, I was a deputy.
4          MR. WAYMIRE:  When did you start?
5          THE WITNESS:  I started 2003, I believe.
6  BY MR. DODD:
7      Q    Okay.
8      A    And had a brief separation for six months when I
9  worked for the City of Cairo.
10     Q    Let's back up.  Before you became the jail
11 administrator, that's the capacity you were talking about?
12     A    Yes, sir.
13     Q    You also worked with the Grady County Sheriff's
14 Department, and about how long was that?
15     A    I would say a year-and-a-half or so.
16     Q    Were you a road deputy?
17     A    Yes.
18     Q    Road deputy, okay.  Then you said you left for
19 about six months?
20     A    Yes.
21     Q    And where did you work?
22     A    Cairo Police Department.
23     Q    And what did you do for the Cairo Police
24 Department?
25     A    Patrol.

1        Q     Do you have any other law enforcement background?

2        A     I worked for the City of Pelham for a brief stint.

3   I worked for the City of Donalsonville.  And I was in state

4   corrections in Florida.

5        Q     Pelham and Donalsonville, how long did you work

6   for them?

7        A     Donalsonville, probably like eight or nine months.

8   That was just coming out of the academy for Georgia and was

9   trying to find something closer to home, wound up in Pelham.

10  And I had applied with Pelham and Grady at the same time.

11  Pelham picked me up first and then Grady came through with

12  their offer, which was my home county where I was living so

13  I continued working part-time for Pelham while I worked full

14  time for Grady, just to help them out.

15       Q     And how long did you work at Pelham?

16       A     Full time, probably four or five months, and then

17  part-time I continued on for another, say, half a year.

18       Q     And the six months that you were -- the gap when

19  you were working as a road deputy and then you came back as

20  the chief jail administrator, what caused that six months

21  gap?  Did you decide to leave or --

22       A     Well, there was an election.

23       Q     That's what I was getting to.

24       A     Yeah, there was an election coming up and I felt

25  it was -- I had an offer here with the City and --

1    **Q**    You were supporting not the incumbent sheriff?

2    **A**    The incumbent wasn't running again.

3    **Q**    He was not?

4    **A**    No.

5    **Q**    So how did the election affect your decision to

6  work for the City?

7    **A**    Well, I wasn't sure who was going to win the

8  election.

9    **Q**    I see.  So you wanted to be able to get a job when

10  you could, rather than wait, new sheriff, you might be gone?

11    **A**    (Nods head.)

12    **Q**    Is that right?

13    **A**    Right, there was only one opening and there was no

14  telling how many vacancies were going to be there.

15    **Q**    I understand.  Is Grady County your home county?

16    **A**    No, sir.

17    **Q**    How long have you lived in Grady County?

18    **A**    I want to say '99, 2000, somewhere in there.

19    **Q**    How did you come here?  Did you have family here?

20    **A**    My wife and I were in Tallahassee and she owned a

21  business in Tallahassee and I owned a business in Bainbridge

22  and Calvary, Georgia, which is in Grady County, was a good

23  split as far as driving distances between the two.

24    **Q**    Okay.  So you all compromised so she could get to

25  work and you could get to work?

1     A     Right.

2     Q     Tell me a little bit about your Florida

3 corrections work.

4     A     Certified for Florida corrections in '93, worked

5 in a couple of state prisons for a few years, just security

6 work.

7     Q     Were you in the administration at all there?

8     A     No, just front line.

9     Q     Detention officer?

10    A     Corrections officer.

11    Q     Sorry, corrections officer.  Do you have any POST

12 certifications?

13    A     Yes, I am POST-certified law enforcement.

14    Q     Basic law enforcement?

15    A     Basic law enforcement.

16    Q     Do you have any POST credentials or certifications

17 as to detention?

18    A     No, sir, I do not.

19    Q     Or administration?

20    A     I'm not familiar that there is an administrative

21 certification.

22    Q     There is for a detention officer; is there not?

23    A     There is for a detention officer.

24    Q     Did you look into having your Florida corrections

25 work transferred into Florida -- into Georgia, excuse me.

1  **A** I had looked into it at one time but after four

2 years of being inactive, it's no longer valid.

3  **Q** So you have had to start over?

4  **A** It expired.

5  **Q** So you have to start over again?

6  **A** Right.

7   (Discussion off the record.)

8  **Q** Let me do it without those notes.  Were you on

9 duty on the 21st of August, 2009 when this attack took

10 place?

11  **A** No.

12  **Q** When did you find out about it?

13  **A** I got a phone call immediately after.  I don't

14 recall exactly what time it was.

15  **Q** Okay.  And who called you?

16  **A** I can't accurately recall which officer called.

17  **Q** What were you told when you were called?

18  **A** To my best recollection, that there had been a

19 fight and it appeared that one of the inmates was seriously

20 injured.

21  **Q** And that inmate turned out to be Mr. Harry?

22  **A** Right.

23  **Q** Had he already been transported to the hospital?

24  **A** At that time?

25  **Q** Yes.

1    A    They said that they were in route.

2    Q    In route.  Did you have any of the officers, any

3   of the detention officers or deputies go to the hospital

4   with him?

5    A    Yes.  I proceeded immediately to the hospital

6   myself.

7    Q    You did?

8    A    Yes.  And I don't recall who was there but I do

9   recall that I did have staff on scene.

10    Q    And did y'all alert Mr. Harry's family?

11    A    Yes.

12    Q    How was that done?

13    A    Again, I don't recall who called me, but I had

14   been told that they had been notified.

15    Q    Did y'all stay at the hospital then?

16    A    I did for some time while they were in the ER.

17    Q    And about how long was that?

18    A    It would be a guess.  I mean, I feel like I was

19   probably there an hour, hour-and-a-half.

20    Q    Did you leave any officers there after you left?

21    A    I do not recall.

22    Q    Are there any records that would show who was at

23   the hospital with you?

24    A    I don't know.  I can say probably -- possibly they

25   may have put it in the logbook, the sergeant's logbook, who

1   left with the inmate to go to the hospital.

2       Q   And that's called the sergeant's logbook?

3       A   Right, it's kept in the booking area.

4       Q   Tell me what is kept in the sergeant's logbook?

5       A   Unusual occurrences, security checks, routine

6   schedules as far as meals, passing out medications.

7       Q   Okay.  So there might be a note in there, meal was

8   served at such and such a time?

9       A   Right.

10      Q   Is that right?

11      A   Right.  Recreation.

12      Q   I'm sorry?

13      A   Recreation times.

14      Q   Recreation times.  And then you mentioned --

15      A   Transport stuff to the hospital and other

16  facilities.

17      Q   And would it also have shown -- does it show

18  generally evening medication given at such and such a time

19  or would it show each individual?

20      A   Just general.

21      Q   Just general.  Before the attack, when was the

22  last time you were at work in the jail?

23      A   May I ask what day of the week?

24      Q   You can, and I may even be able to find it.  Do

25  you have a regular schedule?

1     **A**    Monday through Friday, 8:00 to 5:00.

2     **Q**    8:00 to 5:00.

3     **A**    Well, that's what it's supposed to be.

4     **Q**    Sometimes you don't get to leave right at 5:00?

5     **A**    Right, and sometimes I get called in the middle of

6 the night to go to the hospital.

7     **Q**    But your normal schedule would be Monday through

8 Friday, 8:00 to 5:00?

9     **A**    Right.

10    **Q**    When you're not there, who would be there?

11    **A**    Shift supervisor.

12    **Q**    All right.  I'm led to believe it was about

13 7:40 on a Friday night.  So you would have left a couple,

14 three hours before that if you worked your regular shift?

15    **A**    Right.

16    **Q**    When you're not there, is there a regular person

17 who acts as the supervisor in your stead?

18    **A**    We have rotating shifts.

19    **Q**    Okay.  And who would do that?

20    **A**    It would be whoever the officer in charge for that

21 particular shift is.

22    **Q**    So it rotates around.  Do you have a lieutenant

23 under you?

24    **A**    I do.

25    **Q**    Who is that?

1        A     John Walton.

2        Q     John Walton.   And was he the lieutenant under you

3    in August of 2009?

4        A     Yes, he was.

5        Q     Does he have a normal shift that he works?

6        A     8:00 to 5:00, Monday through Friday.

7        Q     So he generally works the same shift as you?

8        A     He comes in sometimes on weekends for visitation

9    and stuff like that, but generally, yes, 8:00 to 5:00.

10       Q     And then other times I assume are covered by

11   sergeants or someone below that?

12       A     Correct.

13       Q     And who would have been the sergeants on the

14   evening of the 21st of August, 2009?

15       A     Tito Hall.

16       Q     Sergeant Tito Hall?

17       A     Right.

18       Q     And do you know who else would have been on that,

19   on his shift with him?

20       A     Johnny Martin, Miriam Scott.

21       Q     Okay.

22       A     Timothy Sean Porter.   And I honestly can't recall

23   who the fifth person was.

24       Q     Is Sergeant Hall POST-certified?

25       A     He is.

1        Q     In detention?

2        A     Yes.

3        Q     And was he in August of 2009?

4        A     Yes.

5        Q     Same question on Johnny Martin.

6        A     I don't believe he was.  He was in his six-months

7   probation.

8        Q     Miriam Scott?

9        A     I believe she was.

10       Q     And would there be records to verify that?

11       A     Yes.

12       Q     And you keep those as well?

13       A     I have those actually downstairs in the courthouse

14   in our personnel.

15       Q     Personnel files?

16       A     Yes.

17       Q     And Tim Poitevint?

18       A     Poitevint, again in his six-months probation.

19       Q     So when they are in the six-months probation --

20   and six months meaning that's the first six months of them

21   being in detention?

22       A     (Nods head.)

23       Q     Then they're not eligible for POST-certification?

24       A     They are as soon as there is an opening in a

25   class.

1    Q    I see.

2    A    So as soon as we hire them, we contact the school.

3    It's through the Dougherty County Sheriff's Office, and we

4    find out when the next scheduled class is.  And so just as

5    soon as we can get them into a class, we do.  We don't

6    necessarily wait six months in order to certify them.  We're

7    given -- we're allowed six months to have it done.  We do it

8    as quick as we can.

9    Q    Would the other officer have been Sandra Green?

10   A    Quite possibly, yes.  And she would have been

11   certified at that time.

12   Q    Is there any officer designated to distribute the

13   medication?

14   A    Generally it's done by whoever is running the

15   kitchen, which at that time would have been Sandra Green.

16   Q    Sandra Green.

17   A    Or -- hold on, I turned 40 last week, so things --

18   Q    It doesn't get any better.

19   A    Stephanie Harrison.

20   Q    Stephanie Harris?

21   A    (Nods head.)

22   Q    How often are medicines given out daily?

23   A    Per the doctor's order or generally I think they

24   are given out generally twice a day as a general call.

25   Like, you know, if you need Tylenol or Sudafed or something

15

1    like that.  But other than that, we look at the doctor's

2    orders on medication.

3            Security can also pass out medication from time to

4    time if the kitchen is too busy, so it's not just their

5    responsibilities but primarily it is.

6        Q    So if I understand what you said, whatever the

7    prescription pill bottle says is what y'all are going to try

8    to do?

9        A    That's what we're going to try to do.

10       Q    And I would assume if it says before a meal, then

11   you try to give it to them before the meal?

12       A    That's right.

13       Q    And if it's bedtime, do you have lights out there?

14       A    We do.

15       Q    What time is lights out?

16       A    Generally around eleven o'clock.

17       Q    So I assume it would be sometime before eleven

18   o'clock that the before-bed pill would be given out?

19       A    Correct.

20       Q    Do you have lights on in the morning?

21       A    Generally around 6:00.

22       Q    Around 6:00.  So if it's a morning medication it

23   would be sometime after 6:00?

24       A    Yes, sir.

25       Q    So the idea for you as the chief jail

1   administrator is whatever that pill bottle says, whatever

2   that doctor order is on the pill bottle, you're going to try

3   to follow that as well as you can?

4       A   As well as I can.

5       Q   And I know you were present when the sheriff

6   answered this area of questions so let me get this out of

7   the way as well.  If a prescription bottle says refill it,

8   do you do that?

9       A   Yes.

10      Q   And if you could, speak up a little bit.

11      A   Yes.  I'm sorry.

12      Q   That's all right.  I heard you because I was

13   looking at you.  She is looking at her keys so she didn't

14   see your lips moving.  I just want to make sure we're clear

15   on the record.

16         And if the prescription pill bottle says renew it,

17   then you all renew it; is that accurate?

18      A   That's accurate.

19      Q   Comes out of the sheriff's budget?

20      A   Yes.

21      Q   And the sheriff said that Grady County paid for

22   it.  Does the County reimburse your budget on that?

23      A   My understanding is that our funding comes from

24   the County.

25      Q   Right.  I guess what I am asking is, they give you

1    x-number of dollars per year for medicine for prisoners or

2    do they do it on a prescription basis whenever it is done?

3        A    There are budget lines that are assigned numbers.

4    But frequently on the medical line, we far exceed the

5    budgeted amount.

6        Q    Far exceed the budgeted amount, all right.  Are

7    you involved in submitting that portion of the budget that

8    deals with the medicine?

9        A    I am.

10       Q    I sort of got that drift this morning.  Is that an

11   area of contention with the county, they're trying to keep

12   your budget under?

13       A    I wouldn't call it contention.

14       Q    What would you call it?

15       A    I don't believe it's contention when they agree to

16   pay whatever bill is submitted.

17       Q    And they do that?

18       A    They do.

19       Q    Do they ever suggest to you to hold it down or is

20   there anything you can do to lessen it?

21       A    Liability is too great, especially in the area of

22   medical need, that in my opinion it's a bargain to do what

23   is right than it is to try to save money in that area.

24       Q    And that's what you tell the county whenever they

25   question you?

1       A    Yes, sir.

2       Q    If the prescription bottle does not say refill,

3  then you don't refill it?

4       A    Based on what the inmate would say to us.

5       Q    Okay.

6       A    If the inmate indicates that it is an ongoing

7  problem and that it needs to be refilled, then we will take

8  them to the doctor that we go see, which is Dr. Bari, and

9  have him assess the situation.  And if he sees the need to

10 re-prescribe that medication or to prescribe a different

11 medication, then we go along with his suggestion or his

12 order.

13      Q    Dr. Bari's order?

14      A    Dr. Bari's order.

15      Q    Do you know when Mr. Reynolds came in to your jail

16 facility?

17      A    I want to say March.

18      Q    Of 2009?

19      A    Correct.

20      Q    And do you know where he came from?

21      A    I personally don't, just hearsay.

22      Q    Hearsay is fine in a deposition.

23      A    It was my understanding maybe Thomas County.

24      Q    Thomas County.  And I know what you are saying but

25 let me make it clear for the record.  He didn't come from

1    the area of Thomas County, he came from the Thomas County

2    Jail?

3        A    That was my understanding.

4        Q    But in jail talk, when you say Thomas County,

5    you're talking about their jail to your jail?

6        A    Yes, sir.  I'm sorry.

7        Q    No, no, that's fine, I understood what you are

8    saying but I may not be the one that reads this later.

9            MR. DODD:  Off the record.

10           (Discussion off the record.)

11   BY MR. DODD:

12       Q    Did he come with any medications?

13       A    From my understanding, yes.

14       Q    And do you know who booked him in?  Is that the

15   right phrase, booking in?

16       A    That is the right phrase, but I'm not familiar.  I

17   didn't look at that.

18       Q    Who led you to believe that he came in with

19   medicines?

20       A    Well, it was more based on the situation that

21   occurred and reviewing when he came in.  It was more of a

22   post-situation briefing that informed me what he was -- what

23   he came in with.

24       Q    Let me make sure I understood what you said

25   because we've used "post" in a couple of different ways this

1    morning or this afternoon.

2        A    I'm sorry.

3        Q    No, no, it's not you.  Again, I'm just trying to

4    get it straight.

5        A    It was an after incident.

6        Q    After the attack, then you got briefed?

7        A    Correct.

8        Q    Before the attack, did you even know Mr. Reynolds?

9        A    Honestly, no.

10       Q    And you said, honestly, no?

11       A    Everything I say is honest.

12       Q    No, no, I understood that.  It's just that again

13   it was so soft I wasn't sure she picked it up.

14       A    I'm sorry.

15       Q    Who briefed you after the attack?

16       A    I would like to say the initial briefing came from

17   Sergeant Tito Hall.

18       Q    Are there documents that would show who actually

19   booked Mr. Reynolds in?

20       A    Yes.

21       Q    What would those documents or that document be

22   called?

23       A    Booking report.

24       Q    Booking report.  And is there only one booking

25   report related to him?

1      A     I'm not sure.

2      Q     Let me ask it this way so I'm clear on what I need

3  to ask for.  If he was booked in more than once, there would

4  be a separate document for each booking?

5      A     Correct.

6      Q     And that booking report would be done

7  contemporaneously or at the same time that he actually is

8  booked in?

9      A     I'm not sure I understand your question.

10      Q     The paperwork to book them in, this booking report

11  would be done at the time he was literally booked in?

12      A     When they are brought to the jail.

13      Q     Right.

14      A     They have to be booked in before they are assigned

15  to housing.

16      Q     And those documents are filled out right then?

17      A     It's on a computer.

18      Q     On a computer, okay.  What would be shown on the

19  booking report?

20      A     General information, name; date of birth; Social;

21  height; weight; address; phone numbers; next of kin.

22      Q     And if he was brought in from another jail

23  facility, would it show that as well?

24      A     It may.  Probably would be more of a side note.

25      Q     And would it show the medicines that he came in

1    with?

2        A    Yes, sir.

3        Q    And on the booking report, would it show when he

4    is to be given the medicine and so on?

5        A    No.

6        Q    That's just on the pill bottles?

7        A    Right.

8        Q    Is that right?

9        A    Right.

10       Q    And you were unfamiliar with the booking report

11   before the attack?

12       A    Correct.

13       Q    Have you looked at it since then?

14       A    I don't recall.

15       Q    Has anyone talked to you about the medicines that

16   he came in with?

17       A    Afterwards?

18       Q    Afterwards, yes, sir.

19       A    Yes.

20       Q    And let me be clear:  No one talked to you about

21   the medicines before the attack?

22       A    No.

23       Q    So afterwards, people did talk to you about the

24   medicines?

25       A    Yes.

1    Q    Do you recall who talked with you?

2    A    I believe that it was Sandra Green.

3    Q    I'm sorry?

4    A    Sandra Green.

5    Q    I missed it that time.  Okay.  And do you know

6 about when Ms. Green talked with you?

7    A    I would like to say the day after.

8    Q    About that time?

9    A    About that time.

10    Q    Do you feel comfortable with, about that time?

11    A    About that time.

12    Q    And I say that because you didn't sound

13 comfortable saying the next day because you're not sure; is

14 that fair?

15    A    That's fair.

16    Q    But somewhere around that day?

17    A    Yes, sir.

18    Q    What did Sandra Green talk with you about?

19    A    That he had been on medication, medication had ran

20 out, there were no refills.  I believe she had asked him, is

21 this a type of medication that you need to continue, and he

22 replied, no.

23    Q    Do you know what Risperidone is?

24    A    I do not.

25    Q    Have you ever known?

1    A    No.

2    Q    Do you know if Ms. -- I keep calling her Ms. -- if

3  Officer Green knows?

4    A    I can't speculate.

5    Q    But she never said, hey, I know what it is?

6    A    Not to my knowledge.

7    Q    Not to your knowledge.  And Diphenhydramine, do

8  you know what that is?

9    A    Yes, I believe that's commonly known as Benadryl.

10   Q    All right.

11   A    Or that may be an ingredient.  It's a sinus type.

12   Q    Antihistamine?

13   A    Antihistamine, there you go.

14   Q    Do you know any of the other uses of that drug?

15   A    Well, I have had experience with the process of

16  manufacturing methamphetamine, and I know that -- that is

17  the reason I know that name of that drug is because --

18   Q    Because it's mixed in with methamphetamine?

19   A    It can be in one method, yes.

20   Q    You don't know the medically-appropriate

21  advantages of that drug, you just know how --

22   A    From personal use, I do.  I have had allergies my

23  whole life.

24        MR. WAYMIRE:  Off the record.

25            (Discussion off the record.)

BY MR. DODD:

Q    Okay.  What did Ms. -- Officer Green tell you
other than these are the medicines he was on, the
prescription didn't show a refill so it wasn't refilled.
And then she did go to the prisoner and say, do you want
this refilled or does it need to be refilled.  Did she tell
you anything other than that?

A    I don't recall.

Q    Okay.  Was anybody else in that conversation?

A    I don't recall.

Q    Nobody to your memory?

A    I have people in my office all the time.

Q    I appreciate that, I do.  And I realize it's a
long time ago.

A    Yeah.

Q    All I am trying to do is get your best memory.  I
know it's a memory.

A    And all I'm trying to do is be honest.

Q    That's fair enough.

A    Not trying to avoid.

Q    I understand.  And documents, did you make any
kind of document or did you tell her to make any kind of
document or a note?

A    I did not.

Q    You did not.  You don't know if she did or not?

26

1      **A**    I don't know if she did.

2      **Q**    Fair enough.  Now, was Mr. Reynolds to your

3  knowledge ever taken to a doctor, Dr. Bari -- am I saying

4  that right?

5      **A**    Bari.

6      **Q**    Dr. Bari or Dr. Dekle.

7      **A**    I'm not sure.

8      **Q**    But the medical records would show that in his

9  jail file?

10     **A**    Right.

11     **Q**    True?

12     **A**    Yes.

13     **Q**    And after the attack, do you know whether or not

14  Mr. Reynolds was put back on medication?

15         **MR. WAYMIRE:**  Just to be clear, at any time until

16      the present or at the Grady County Sheriff's Office?

17         **MR. DODD:**  Well, he can say he doesn't know if it

18      didn't happen there.

19     **A**    I don't know.

20  BY MR. DODD:

21     **Q**    You don't know, all right.  Was Mr. Reynolds kept

22  at the Grady County Jail facility after the attack?

23     **A**    I believe so.

24     **Q**    Do you know about how long that was?

25     **A**    I don't.

1    **Q**    Do you know whether or not it was until he entered

2    his plea?

3    **A**    I don't.

4    **Q**    You don't know.  Fair enough.  And was he

5    segregated or put into isolation?

6    **A**    I know that immediately following, he was.

7    **Q**    And was he kept there until his plea?

8    **A**    I don't know how long he was with us, if we housed

9    him somewhere else.  Sometimes in those situations --

10    **Q**    Fair enough.  And that was a bad question.  I

11    assumed something I shouldn't have assumed.

12            For as long as he was in your jail facility, was

13    he kept in an isolation room?

14    **A**    Post-incident, he was.

15    **Q**    The entire time?

16    **A**    Yes, sir.

17    **Q**    Did he act up to your knowledge at all during that

18    period of time, from the incident until he left your

19    facility?

20            **MR. WAYMIRE:**  Let me object to the extent that act

21        up is vague.

22            **MR. DODD:**  It is vague.  Let me clear that up.

23    BY MR. DODD:

24    **Q**    Did he cause any disciplinary problems at all in

25    your facility during that period of time?

1      **A**    I do not recall.  I don't believe so.

2      **Q**    Prior to the attack, did anybody alert you to

3   anything that unusual about Mr. Reynolds?

4      **A**    No.

5      **Q**    Let me switch gears a little bit.  Let me ask you

6   this:  Do you know why Mr. Reynolds was in your jail?

7      **A**    It's been a while since I looked at any of that

8   information, I couldn't --

9      **Q**    I have been handed what looks like an arrest

10  booking report.  And it looks like three pages of the

11  document.  I'm going to let your lawyer look at it.

12          I can represent to you and your lawyer that it

13  came out of the GBI file and it has their stamping on it.

14  But I just want you to look at it and see if that helps you

15  with -- I'm asking you about the booking and maybe we have a

16  document that may help you.

17          **MR. WAYMIRE:**  (Reviewing document.)

18          **MR. DODD:**  Off the record.

19          (Discussion off the record.)

20  BY MR. DODD:

21      **Q**    Back on the record.  I have showed you a

22  three-page document.  In fact, let me do this, if we can,

23  let me mark each one of these in your --

24          **MR. MURRAH:**  They're marked already.

25          **MR. WAYMIRE:**  I'm comfortable if you would do it

1          this way, for you just identifying them by the label.

2               MR. DODD:  That's fair enough.

3     BY MR. DODD:

4          Q    This is shown as Plaintiff's Exhibit GBI,

5     Exhibit 7, Page 4.  Let's look at that one first.  Tell me

6     what that is.

7          A    It's an arrest booking report.

8          Q    Is that what you were referring to earlier for

9     Mr. Reynolds?

10         A    Yes, it is.

11         Q    Tell me what you can glean from that document.

12         A    I'm sorry, sir.  What I can what?

13         Q    What you get from that document.  Sorry, I talk

14    like a damn lawyer sometimes.

15              MR. WAYMIRE:  Other than what it actually says?

16              MR. DODD:  Yeah.

17    BY MR. DODD:

18         Q    Tell me first of all:  Does that help your memory

19    of having looked at that document in the past?

20         A    Yeah, it answers some questions that I previously

21    could not answer for you.

22         Q    That's what I'm getting to.  What can you tell me

23    based on that document?

24         A    Based on the question that you previously asked

25    that I could not answer?

1      Q      Right.

2      A      That the booking officer was Shawn Patterson.

3      Q      Is Shawn Patterson a POST-certified detention

4    officer?

5      A      Yes, she is.

6      Q      Okay.

7      A      And was on that date.

8      Q      Okay.

9      A      The arrest date was March 23rd, 2009.  I told you

10   he did come to our -- I believed he came in March; the

11   location of his pickup was the Thomas County Jail; and that

12   Lieutenant John Walton was the officer that went and got

13   him, and he is certified and was at that time; that he had a

14   hold for Brooks County parole; and that he had a hold for

15   our investigative Lieutenant Clark, chief investigator for

16   the Grady County Sheriff's Office.

17     Q      And was that hold by Lieutenant Clark the reason

18   he was transported to your facility?

19     A      Correct, based on -- I'm sorry.

20     Q      Is that right?

21     A      That's right.

22     Q      Is there any other information on Exhibit 7,

23   Page 4, that you can share with us?

24     A      I mean, there is all kinds of information.  Do you

25   want me to read the whole thing line by line?

31

1      Q    No, let me take a look at it.

2      A    I mean, there's his personal information at the

3   top, height, weight, date of birth, Social.

4      Q    This guy is 5'9", 225 pounds?

5      A    If that's what it says, that's what it says.

6      Q    Do you know Mr. Harry's size?

7      A    Not without looking at a similar document.

8      Q    And Mr. Reynolds' booking -- age of booking 41,

9   current age 42.  Why is there a difference?

10     A    Possibly had a date of birth 6/16/67, because he

11  was arrested in March and he was in jail during his

12  birthday.

13     Q    Okay.  Does it show what he's being held for for

14  your county's purposes?

15     A    Not on this document.

16     Q    Let me show you Plaintiff's Exhibit GBI Exhibit 7,

17  Page 5, and Exhibit 7, Page 6.  Let me show them to you at

18  the same time.

19     A    Okay.

20     Q    Does it show why he is there now?

21     A    Yes.

22     Q    What does that say?

23     A    Burglary and criminal damage to property in the

24  second degree.

25     Q    All right, sir.  And who would classify him?

1    Well, let me back up first.  Does your jail facility

2    classify prisoners?

3         A    The computer to an extent will classify as you

4    will see on the first page.

5         Q    Page 4 shows medium classification?

6         A    Yes.  Based on the type of charge.

7         Q    Does that take into contract his criminal history?

8         A    No.

9         Q    Does it take into account any information that

10   Thomas County may have on him or any other county?

11        A    If Thomas County told us when we picked him up

12   that he was a significant risk for escape or for harm to

13   himself or others, then that would be a side note that we

14   would make and we would highlight that and we would

15   segregate him.

16        Q    Based on this paperwork, it doesn't appear that

17   happened?

18        A    No, especially based on his medical questionnaire.

19        Q    Okay.  Let's deal with the second page first then.

20             MR. WAYMIRE:  And that's Page 5, right?

21             MR. DODD:  Page 5.

22   BY MR. DODD:

23        Q    Do you have the capability at your jail facility

24   to run a criminal background check on Mr. Reynolds?

25        A    No, sir, I do not.

1     Q    Does the sheriff's department have that
2    capability?

3     A    The sheriff's office would on the administrative
4    side, 8:00 to 5:00, Monday through Friday.

5     Q    And why is it limited to those days?

6     A    That's when there is staff who is certified on
7    that terminal is working.  We have a multicounty 911 system,
8    and they are under their contract, they are not obligated to
9    run criminal background checks for us just, you know, tags,
10   driver's license, check for warrants, that sort of thing.

11    Q    Well, how do you run a criminal background check
12   on someone then?

13    A    Usually that's done by the investigator.  In a
14   felony case such as this, it would be part of their case
15   file.

16    Q    But the jail doesn't do that routinely?

17    A    No, sir.

18    Q    Do you know Mr. Reynolds' criminal background?

19    A    I do not.

20    Q    What would put an inmate into a high risk
21   category?  Mr. Reynolds is medium, right?

22    A    Right.

23    Q    Based on burglary and criminal damage?

24    A    Right.

25    Q    If his arrest had been, say, for aggravated

1    assault or armed robbery, would that put him in high?

2        A    If we had that knowledge at the time of booking,

3    then possibly.

4        Q    When you say, possibly, what's -- why would it be

5    sometimes high and sometimes not?

6        A    Depending on whether he was convicted, what the

7    disposition of the case was.

8        Q    If he was convicted, would it make him into a

9    high?

10       A    Aggravated assault?

11       Q    Yes, sir.

12       A    Yeah, I would consider that to be high.

13       Q    Armed robbery?

14       A    Yes.

15       Q    Obstruction of an officer?

16       A    Depending on the situation.

17       Q    Which you would inquire into it more?

18       A    Right.

19       Q    And if he had possession of a firearm during the

20   commission of a crime, would that automatically put him in a

21   high or would you inquire more?

22       A    I would inquire more because, I mean, they're

23   strip-searched before they're put in the bottom so if they

24   don't have a firearm on them --

25       Q    That probably isn't going to be a factor?

1      A    Probably not.

2      Q    And then there is a third page and that would be

3   Page 6, and you had referred to that earlier.

4      A    Medical questionnaire.

5      Q    Yeah, the medical questionnaire.  Who fills that

6   out?

7      A    The booking officer.

8      Q    And where do they get the information from?

9      A    The inmate.

10     Q    Have you ever known an inmate to mislead a

11   correctional officer?

12     A    I have known people to lie.

13     Q    Including inmates?

14     A    Including inmates.

15     Q    All right.  Tell us what that questionnaire shows.

16     A    Line by line?

17     Q    Well, that's a fair question.  Let me ask:  It's

18   on this questionnaire that the two drugs he was on are

19   identified to the booking officer, correct?

20     A    Correct.

21     Q    And you all require that they have a prescription

22   to show he is on those kinds of drugs or can the inmate just

23   anecdotally say, hey, I'm on something else?

24          MR. WAYMIRE:  For purposes of filling out this

25      form?

1   MR. DODD: Yes.

2   A   For purposes of filling out this form, they can

3   say pretty much anything they want to. But if they didn't

4   show up with the medication in hand and they don't have

5   proof that can be brought to the jail by a family member,

6   then they're going to have to go to our doctor, Dr. Bari,

7   and be evaluated and see if that is a true need.

8   BY MR. DODD:

9   Q   Okay. All right. In Mr. Reynolds' case, his

10  medicine runs out and he isn't given any more, true?

11  A   I would like to qualify that answer.

12  Q   Sure.

13  A   He isn't given any more because he stated he

14  didn't need any more.

15  Q   I follow that, okay. And he can't take medicine

16  on his own, that's something that you all will control in

17  the jail setting, true?

18  A   True.

19  Q   Whether that's -- whatever kind of pill it is, not

20  just a pain medication or narcotic or something like that, I

21  think that's what most people think about, but even if it's

22  a, you know, for an infection, all pills in the jail are

23  controlled by the jail and not just pills, medicine, have to

24  be controlled by the jail, true?

25  A   True.

1     Q   Otherwise you can't control it because you don't

2  know where it's going to go, you don't know how much they

3  are going to take and what have you?

4     A   True.

5     Q   So to that extent, you're going to control the

6  delivering of the medicine to the inmates, right?

7     A   Right.

8     Q   And you follow strictly what is on that

9  prescription label in terms of when you give it, how much

10  you give, how long you give it?

11     A   Correct.

12     Q   Not discretionary, you don't decide one day he

13  doesn't look like he needs it, you follow that, period?

14     A   We try.

15     Q   As best you can?

16     MR. WAYMIRE:  For a prescription you are talking

17    about?

18     MR. DODD:  Yeah.

19 BY MR. DODD:

20     Q   For prescription drugs, you follow what the doctor

21  said?

22     A   As best we can.

23     Q   And when I said that about medicines, I wasn't

24  talking about an aspirin here or there.  Y'all can, the

25  jailer, you, under your control, y'all can decide maybe they

1   need an aspirin or something nonprescription?

2       **A**    At their request.

3       **Q**    At their request, okay.  But otherwise, you don't

4   exercise, and you don't let anybody under you exercise, any

5   discretion about withholding a pill?

6       **A**    No.

7       **Q**    No?

8       **A**    No.

9       **Q**    And then I understand that you then ask the

10  inmate, do you need to stay on this medicine?

11      **A**    Yes.

12      **Q**    Okay.  And if they say, no, that's the end of it?

13      **A**    I believe in this case, that was the situation.  I

14  believe that people come in with medications sometimes that

15  are for a specific period of time.

16      **Q**    Right.

17      **A**    To take care of whatever the ailment is.  And

18  without having medical knowledge as far as what that

19  prescription is prescribed for, there is no way for a person

20  who has no medical training or no pharmaceutical training to

21  know that that was supposed to be ongoing, and we trust the

22  inmate's response to be truthful and accurate.

23      **Q**    And you don't have, and I think you have already

24  answered this for yourself, but let me expand it.  You don't

25  have nor does any of your staff have pharmaceutical or

1    medical training about these drugs?

2        A    Not at all.

3        Q    It just isn't what you do, right?

4        A    Right.

5        Q    And you don't have an in-jail medical person?

6        A    No.

7        Q    So you take --

8            MR. WAYMIRE:  Object to the form of that question.

9        Just to be clear, I think there is a doctor who is

10       somehow associated with the jail.

11           MR. DODD:  Let me clean it up.

12   BY MR. DODD:

13       Q    You don't have a medical person in the jail

14   helping you make those decisions?

15       A    No.

16       Q    No?

17       A    No.

18       Q    Okay.  With Mr. Reynolds when he says he doesn't

19   want any more medicine, doesn't need it, why didn't you or

20   someone working for you go to Dr. Bari -- am I saying that

21   right?

22       A    Correct.

23       Q    And say, will you check him out?

24           MR. WAYMIRE:  Object, that calls for speculation.

25           You can answer if you know.

```
1      A    I can answer only for myself.  I had no knowledge
2  that the medication had ran out.  I had no knowledge what
3  the medication was for.
4  BY MR. DODD:
5      Q    Okay.  We talked about running a criminal history
6  and that you don't do that when you book people in, true?
7      A    True.
8      Q    And I take it then you don't run a mental health
9  history whether or not he's been in and out of Southwestern
10 State Hospital when you book him in?
11     A    I will refer to your Page 6, Exhibit 7, Page 6.
12     Q    Okay.
13     A    And I will -- (Reading)  Question:  Has inmate
14 recently seen a medical or psychiatric doctor for any
15 illness?  Answer by the inmate, no.
16     Q    Okay.  Go ahead.
17     A    Give me one second.
18     Q    Take your time.
19     A    "Has the inmate recently been hospitalized?"
20 Answer:  "No."
21     Q    Okay.
22     A    "Does inmate have any other medical problems we
23 should know about?  If yes, list problems."  "None."
24     Q    Okay.  What's the definition of the word
25 "recently" in those questions?
```

41

1    A    What's the definition of the word "recently" in

2  the dictionary?  I mean --

3    Q    I don't know.

4    A    I don't know.

5    Q    Not defined on that paper?

6    A    It is not.

7    Q    What were the dates of the prescriptions that he

8  came in with?

9    A    I don't know.  It's not reflected on this report.

10    Q    If the prescriptions were prescribed in the last

11  90 days, would that be recent from your point of view?

12    A    Depends on the number of pills in the bottle and

13  the frequency that you were supposed to take them.  That

14  would depend -- I mean, if it's a 90-day prescription and

15  it's one pill a day and there's 90 tablets, I would say

16  that's recent.

17    Q    Okay.

18    A    If it was take four tablets a day and there was 30

19  pills a day in it and it was from three months ago, I would

20  say no.

21    Q    Is that how you instructed the booking person?

22    A    I have not instructed them.

23    Q    Did not instruct them on that?

24    A    Did not.

25    Q    And did you give them, that is, the booking

1  people, a definition, your definition of "recently"?

2      A    I did not.

3      Q    I know we're getting close to lunch so let me get

4  to a stopping point.

5           When you came on as the chief jailer, apparently

6  there was a previously written manual?

7      A    Yes.

8      Q    A policy, procedures, standard operating procedure

9  kind of thing?

10     A    Yes.

11     Q    And I understand that that was during your tenure

12 used more as a guideline not as a this is how we do it?

13     A    Correct.

14     Q    And do you have a draft of a new one?

15     A    It's a work in progress.  I do have some paper

16 drafts, part of it but not complete.

17     Q    I'm sure some of it is in your head and you just

18 haven't gotten it down on paper?

19     A    I have got some down on paper.

20     Q    You do, okay.  And where are those papers kept?

21     A    On my desk.

22     Q    On your desk.  And they are in paper form or

23 electronic?

24     A    Handwritten.

25     Q    And you could get ahold of those if we asked for

1  them?

2      **A**    Absolutely.

3          **MR. DODD:**  Is this a convenient time?

4          **MR. MURRAH:**  Just gesturing so you could make the

5      choice.

6          **MR. DODD:**  You know, I'm long past wanting to run

7      people through the lunch hour.  Why don't we stop?  We

8      have 45 minutes until the next one.

9          Does that suit you?

10         **MR. WAYMIRE:**  Yeah.  What do you want to do about

11     this one?

12         **MR. DODD:**  I want to continue it.

13         **MR. MURRAH:**  I don't have a problem with

14     continuing and finishing him and leaving Bahan wait.  I

15     wouldn't think you're talking about another two hours.

16         **MR. DODD:**  I wouldn't think so either.  We can do

17     that.

18         **MR. WAYMIRE:**  I just need to let -- he just needs

19     to know what to do.

20         **THE WITNESS:**  How much longer do you think?

21         **MR. DODD:**  You know, we're moving along pretty

22     rapidly here, maybe another hour, hour-and-a-half, no

23     more than that.

24         (Discussion off the record.)

25         (Lunch recess taken from 12:17 p.m. to 1:35 p.m.)

1          MR. DODD:  We're back, same stipulation,

2      continuation of deposition from before.

3  BY MR. DODD:

4      Q    Give me your full name.

5      A    Timothy Malcomb Gainous.

6      Q    Did you read over the GBI report that they did on

7  this?

8      A    No.

9      Q    Did you discuss with Agent Bahan or any of the

10  other agents their findings?

11      A    No.

12      Q    Did you conduct your own investigation on what

13  happened?

14      A    No, I turned it over to our investigators who

15  turned it over to GBI.

16      Q    And your investigator would have been, I think you

17  said, Lieutenant Steve Clark?

18      A    Correct.

19      Q    Let me clear one point up.  Did I understand

20  because it's a multicounty 911 system that you don't have

21  access to GCIC?

22      A    There is access to GCIC.  There is access.  It's

23  just that their contract with our county stipulates that

24  they don't have to run criminal history checks, extensive

25  history checks.

1        Q        Is there anyone in your department, and when I

2    say, your department, let me clarify, in your jail

3    administration part, secretaries, paralegals, whatever you

4    call them, that are GCIC-certified?

5        A        In the jail, my secretary is GCIC-certified.

6        Q        In the jail, okay.  And what is her name?

7        A        Janice Lashley.

8        Q        Lashley?

9        A        L-a-s-h-l-e-y.

10       Q        And was she your secretary in the summer of 2009?

11       A        Correct.

12       Q        And she was GCIC-certified then?

13       A        I believe so.  The reason I say, I believe so, is

14   they're -- they've done a lot of changes with GCIC and it's

15   required a lot of updates and a lot of -- as a matter of

16   fact, people had to start back over from scratch.  And so

17   I'm not sure as far as the dates if she was at that time in

18   compliance or not.

19       Q        All right.  But she's our most likely candidate in

20   the jail?

21       A        In the jail, she's the only person certified to

22   run it because she prepares the state court docket and

23   prepares all the paperwork to go to the state court docket.

24   And you have got somebody that maybe has a DUI, so she would

25   run a history to see if it's their first DUI, second, or

46

1   third.

2       Q   Sure, that makes sense.  All right.  After the

3   attack, did you go to the -- I think you told me you did go

4   to the hospital?

5       A   Yes.

6       Q   I got off-track there.  Did you ever talk with any

7   of the family members of Mr. Harry?

8       A   No.

9       Q   Did you ever talk with --

10      A   I say I didn't.  I don't recall.  It doesn't stand

11  out.

12      Q   Fair enough.  Nothing unusual if you did other

13  than pleasantries?

14      A   Correct.

15      Q   Is that fair?

16      A   Yeah.

17      Q   Did you on the other hand talk to any of the

18  family members of Mr. Reynolds?

19      A   Not to my recollection.

20      Q   Do you know to your knowledge any of his family

21  members?

22      A   Not that I'm aware of.

23      Q   And had you ever seen him in and out of your

24  facility before, your jail facility?

25      A   I can't recall that I have.

1      Q      Did you have any reports from anybody, whether it

2   was an inmate, whether it was hearsay, whether it was a

3   staff member, anything unusual about Mr. Reynolds before the

4   attack?

5      A      No.

6      Q      And I know you don't have a written operating

7   procedure or policy, but have you told your staff that

8   anything that's unusual in the jail needs to be reported to

9   you or to the lieutenant?

10     A      Absolutely.

11     Q      Whether it's verbal or in writing, they need to

12  let you know?

13     A      Our most common question is, do you consider

14  yourself a threat to others or yourself.

15     Q      Right.

16     A      And if they answer yes to either, we take them to

17  a secluded cell and give them what we call a suicide

18  mattress and a smock that can't be unraveled so they can't

19  hang themselves by anything, and we put them on a 15-minute

20  watch.

21     Q      That means, I guess, that every 15 minutes someone

22  puts eyes on them?

23     A      Right.

24     Q      Speaking of that, how are the pods monitored?   I

25  got an impression that there's somebody higher up that can

1    look down in the pod?

2        A    Like a crow's nest?

3        Q    Yeah, that's a good description.  Is that what

4    it's called, a crow's nest?

5        A    It's just called the pod.

6        Q    And there is an actual physical person up there?

7        A    Yes.

8        Q    And they keep eyes on different pods?

9        A    Yes.

10       Q    How many pods are there?

11       A    Eight, I believe.

12       Q    How many cells per pod?

13       A    It varies.  Our single cell lockdowns might have

14   six and then our open-bay dorm could house up to like 24.

15       Q    And in the pod where this attack took place, that

16   was an open bay?

17       A    I'm not sure.  I believe it was, but I'm not sure.

18       Q    Do you recall the name of the pod?

19       A    I don't.

20       Q    But that would be in the paperwork as to which

21   pod?

22       A    It would be.

23       Q    Is there any audio monitoring of pods or video

24   monitoring of pods?

25       A    At that time, there was not.

1      Q    Was not, okay.  Since then, has that been

2  installed?

3      A    I have installed a camera in each.

4      Q    A camera in each video?

5      A    Yes.

6      Q    Or a video and audio?

7      A    Just camera.

8      Q    Just video, okay.  And who monitors that?

9      A    It is monitored at Central Control.

10     Q    Is that the same person who is up above?  No,

11 that's a different person?

12     A    Different person.

13     Q    And if someone in Central -- did you call it

14 Control?

15     A    Central Control.

16     Q    Is there someone there 24/7?

17     A    Yes.

18     Q    And they have the various monitors?

19     A    Yes.

20     Q    Back in the summer of 2009, were there video

21 monitors or video cameras or were they broken or had they

22 never been installed?

23     A    They were not installed in the housing area.

24     Q    In the?

25     A    Housing area, in the pods.

1     Q    Where were they installed?

2     A    I think we had, like, maybe one in Booking, one in

3 the sallyport, one covering the outside of the building.

4     Q    All right.  To your knowledge was there any

5 disciplinary action or any incident reports filed concerning

6 Wade Harry before the attack?

7     A    To my knowledge, no.

8     Q    Do you know why he was being held in the Grady

9 County Jail?

10     A    I remember it wasn't anything terribly serious.  I

11 want to say -- it would be a guess, but I would say child

12 support or something like that.

13     Q    His failure to comply with child support?

14     A    Again, to the best of my recollection, yeah.

15     Q    I'm not trying to quiz you.

16     A    Yeah.

17     Q    Before we got off at lunch, the question I wanted

18 to ask was --

19          (Discussion off the record.)

20     Q    Before we went to lunch, what I wanted to ask was:

21 Other than asking the inmate himself or herself, do you need

22 to stay on this medicine, do you verify in any way whether

23 or not they do?

24     A    It's not a written policy but it's the general

25 practice of the kitchen supervisor that handles the

1    medication, that they would call Dr. Bari and ask his advice

2    as far as, you know, giving this medication, what do you

3    think.

4        Q    I see.  And that would have been this Officer

5    Green, Sandra Green?

6        A    It could have been Ms. Green or it could have been

7    Ms. Harris.

8        Q    Or Ms. Harris.  Do you know if that was done in

9    Mr. Reynolds' case?

10       A    I'm not sure.

11       Q    Would there be documents as to any of those calls?

12       A    There is not a form that I have for them to log

13   that.

14       Q    So if someone wrote it, they would have written it

15   on their own, they wouldn't have had a form to fill out?

16       A    Maybe would have written it on the pill log or

17   something when they passed the medication out, if they wrote

18   it anywhere.

19       Q    Is there any policy, procedure, or way you do

20   things, however you want to call it, where you would have

21   checked on the medicines other than calling Dr. Bari, looked

22   on the Internet, just called a pharmacist, anything like

23   that?

24           MR. WAYMIRE:  Object to the form for two reasons:

25       One, you're saying you.  Are you asking him personally

1    if he did it?  Secondly -- I'll leave it at that.

2         MR. DODD:  Let me clear that up.

3    BY MR. DODD:

4         Q    When I say you in this circumstance, I mean your

5    jail facility, you as chief jailer and anybody underneath

6    you.  Was there a procedure to look on the Internet about

7    these drugs or call pharmacists or call a doctor?

8         A    Can I let him finish what he is doing?  I'm sorry,

9    and I'm not trying to be disrespectful, but I'm having a

10   hard time concentrating.

11        Q    Yeah, you can.  Let me reask the question and

12   we'll be still over here.

13        A    I'm sorry.

14        Q    That happens to me, too, I get distracted and

15   can't listen.

16             Other than asking an inmate, you as the chief jail

17   administrator or anybody underneath you in the jail

18   structure, is there any procedure policy that's set out

19   rather than just ask the inmate to either call a doctor,

20   pharmacist, or nurse, look on the Internet on any of the

21   medications?

22        A    No.

23        Q    No?

24        A    No.

25        Q    Okay.  If an inmate has a mental disorder, does it

1    make sense to you to ask that inmate if he needs more

2    medicine?

3        **A**    If an inmate answered no on the questionnaire when

4    asked if he had a mental disorder or if he had gone to see a

5    psychiatrist and without being medically trained to

6    understand that the medication he came in with was

7    psychotropic?

8        **Q**    Uh-huh (affirmative response).

9        **A**    Repeat your question.

10       **Q**    Yeah.  Does it make sense to ask someone who has a

11   mental disability or mental disorder whether or not they

12   need their medicine?

13       **A**    If you had prior knowledge to that person having a

14   mental disability or disorder, it would make sense to ask

15   that.  If you don't have that prior information because they

16   have misled you and don't know what the medication was for,

17   then I would say no.

18       **Q**    It doesn't make sense to ask?

19       **A**    It wouldn't make sense to ask it.

20       **Q**    Let me make sure on the video machines because I

21   was probably being distracted, too.  We'll put everything on

22   him right now.

23           Did you say that there were no cameras before and

24   you put new ones in, or there were cameras and they got

25   disfunctional, didn't work, and then you got new ones to

1   replace them?

2       A    The facility was built with no cameras in the

3   back.

4       Q    None, okay.  And then after this date,

5   August 2009, you put cameras back there?

6       A    Yes.

7       Q    And there was none before this date?

8       A    None.

9       Q    All right.  Let me clean up a couple of things

10  that was pointed out to me at lunch that I didn't do this

11  very thoroughly and I think they are probably right.

12           Tell me a little bit about the difference between

13  being a correctional officer in Florida and being a

14  detention officer in Georgia.  Is it just a name difference

15  or is the training different?

16      A    There is some difference in training.

17      Q    Good.  Tell me what you observed in the difference

18  in training.

19      A    Hours required.

20      Q    Is it more in Florida or in Georgia?

21      A    More hours in Florida.

22      Q    In Florida?

23      A    Yes.

24      Q    What is the difference?  Do you know about what

25  the difference is?

1          MR. WAYMIRE:  In terms of hours?

2          MR. DODD:  In terms of hours.

3     A    I believe I had 6- to 700 hours in Florida in just

4 corrections.  In Georgia, the basic jailer's course is 80

5 hours.

6 BY MR. DODD:

7     Q    Okay.  Any other differences?

8          MR. WAYMIRE:  I'll guess you're asking about

9     content; am I right?

10         MR. DODD:  Yeah, content in the training.

11    A    That's too broad.

12         MR. WAYMIRE:  Well, just answer it yes or no maybe

13    to this.  Is there a difference in content, different

14    substance taught in your Florida training versus the

15    basic jail officer course?

16         THE WITNESS:  Yeah, the basic jail officer course

17    in Florida is a three-ring binder this (indicating)

18    thick, and the basic corrections in Florida is two

19    binders this (indicating) thick.

20 BY MR. DODD:

21    Q    Okay.

22    A    So I can't cover every section of difference.

23    Q    And the Georgia manual, you indicated, is about an

24 inch-and-a-half?

25    A    Right.

1      Q    And the other one's about ten inches?

2      A    Right.

3      Q    So much more in-depth, many more subjects covered

4   in Florida?

5      A    Correct.

6      Q    Now help me with the timeline.  You get certified

7   in Florida and you're a corrections officer for what period

8   of time?

9      A    '93 to '97, maybe.

10     Q    So about four years.  And then you go into

11  business, is that what you told me?  You had a business?

12     A    I had a business in Bainbridge.

13     Q    And that didn't have to do with law enforcement or

14  corrections?

15     A    No.

16     Q    What was it?  Now that you're smiling, you got me

17  curious.

18     A    I sold fireplaces, gas logs, grills.  It was a

19  hearth and patio.

20     Q    Unrelated to law enforcement or corrections?

21     A    Uh-huh, some of the best years of my life.

22     Q    I was going to say, a lot less headaches, right?

23     A    Yeah.

24     Q    And then you get back into law enforcement in

25  Georgia?

1     A   (Nods head.)

2     Q   Is that right?

3     A   Yes.

4     Q   How long were you out of law enforcement during

5 that period of time?

6     A   Somewhere between four years, three to four years.

7     Q   Three or four years.  All right.  In your training

8 in Florida, were you trained where possible to keep violent

9 inmates away from nonviolent inmates?

10    A   I don't recall -- I just don't.  I mean, you know,

11 without making assumptions, I'm sure we hit something on

12 classification.  I mean, it was a pretty big binder, like I

13 say.  But as far as recalling from 1993 the content of the

14 training, I couldn't.

15    Q   Okay.  You don't happen to have those binders, do

16 you?

17    A   No.

18    Q   Let me ask this, then:  Do you know what

19 percentage of your jail population has mental health

20 problems, diseases, disorders?

21    A   I don't know percentage-wise, no.

22    Q   Do you think that's a higher percentage than

23 walking-around people compared to in-the-jail kind of

24 people?

25          MR. WAYMIRE:  Let me object to the extent there is

1       not a time frame on it.  Maybe you're just talking

2       about any given time, but it probably changes.

3           Q    Well, during your tenure as chief administrator of

4    the jail.

5           A    I don't know.  I have got so much experience, I

6    had so many years involvement in the community and in the

7    jail, I think people are just as screwed up walking around

8    as they are.

9           Q    Fair enough.

10          A    I mean --

11          Q    No, that's fair enough.  That's fair enough.

12               (Discussion off the record.)

13          Q    Let me show you what's been marked as Plaintiff's

14   Exhibit 7, Page 8, and Plaintiff's Exhibit 7, Page 9.  Let

15   me show your lawyer first.

16               It's out of the GBI folder or investigation, and I

17   think it is the medication log for Mr. Reynolds.  I just

18   need you to eyeball that for me and verify that's what it is

19   and that's what it shows.

20          A    Yes, sir.

21          Q    Okay.  Let's look at the first page first.  It's

22   Exhibit 7, Page 8.  At the top, Ricky Reynolds is shown and

23   it shows the Risperidone at the top as well.  And tell me

24   how that form works out.  Is there a column for the date?

25          A    Yes.

1    Q    And just identify the columns for me so I
2 can understand.
3    A    Date, time.
4    Q    And that's filled out by the officer?
5    A    The officer, and then there's a spot for the
6 officer's initials.
7    Q    Do you recognize the officer's initials on that?
8    A    It looks like most of this would have been Officer
9 Roy Brock.  As I said, sometimes it's Security at nighttime
10 that passes it out because -- and especially the bedtime
11 meds because the kitchen staff has already left.
12    Q    They're gone for the day?
13    A    They're gone for the day so you are going to have
14 a security officer doing that.
15    Q    What was the officer's name?
16    A    It looks like Roy Brock.
17    Q    Roy Brock, is he still with your department?
18    A    Yes, he is.
19    Q    Okay.
20    A    And I believe, I'm not sure as to his
21 certification at the time, if he was under probation at this
22 time or not.
23    Q    If I could look at it and maybe even ask some
24 intelligent questions here.  So we have date, time, officer,
25 and that officer's initials, correct?

1     **A**    Yes.

2     **Q**    And then the next column is the inmate?

3     **A**    Right.

4     **Q**    And that RR, I guess, would be Ricky Reynolds?

5     **A**    Uh-huh (affirmative response).

6     **Q**    And then that's the column for that and they just

7 go down the column?

8     **A**    Right.

9     **Q**    There is a couple of places here, at least one,

10 where it says, no meds?

11     **A**    Right.

12     **Q**    And what does that mean?

13     **A**    I could only assume that's a refusal.

14     **Q**    Refusal, okay.  And if an inmate refuses a

15 medicine, do you just let that happen or if it's a repeated

16 problem, then you have to do something about it?

17     **A**    To my knowledge, there is no law that says that

18 we -- that they have to receive their medication.

19     **Q**    Okay.  And then --

20     **MR. WAYMIRE:**  Or take it.

21     **MR. DODD:**  I'm sorry.

22     **MR. WAYMIRE:**  He said, receive.  I think he

23    probably meant the inmate --

24     **THE WITNESS:**  Is required to take it.

25     **MR. WAYMIRE:**  -- has to ingest it.

BY MR. DODD:

Q    Then we get down here to it looks like 4/8, 4/9, 4/10 and 4/11 and 4/12. It's largely blank. Do you know what that signifies?

A    It looks like to me what it signifies is that the person who made out this sheet, you can tell it's all the same handwriting, and that they went down and made columns and when the inmate's medication ran out, there was sill room left on the page for if there was more medication left on the bottle, but -- .

Q    And then the second set of columns, 4/13 through 4/28, again there is no medicine given; am I reading that right?

A    I can't answer because there is initials out here.

Q    Right?

A    It could have been that the officer -- and I don't recognize that right off as far as I would have to have -- I don't know if the medication was given and the officer failed to have the inmate sign for it. I just can't make an assumption based on the way they filled it out.

Q    Okay. The idea is that the officer fills everything out but then the inmate initials it?

A    Right.

Q    Okay. And the date and time are filled in in this second set of columns here in the middle, but the officer's

1    initial, do you recognize those initials?

2        A    That's what I'm saying, I do not recognize

3    immediately those initials.

4        Q    But the inmate doesn't acknowledge it?

5        A    Right.

6        Q    And then let's look at Exhibit 7, Page 9, this is

7    also given at bedtime and the first set of columns looks

8    identical in the sense of all the notations match up; do you

9    agree with that?

10       A    I agree.

11       Q    And then the second column does not match up.  It

12   goes from 4/13 down to 4/19 and then just stops?

13       A    Probably out of medication.

14       Q    Probably out of medication.  All right.

15           MR. DODD:  Give me a moment to confer with him.

16           (Recess taken.)

17           MR. DODD:  Two more questions.

18   BY MR. DODD:

19       Q    Do you know what happened to the physical copy of

20   the old standard operating procedure manual?

21       A    I'm sure there's a copy available at the jail.

22       Q    Do you think -- do you know where that is?

23       A    Yes.

24       Q    On your desk or close?

25       A    In my office, probably close by.

1      Q     And if we referred to it as prior to your tenure,

2   prior to you becoming chief jailer, the written manual,

3   would you know what I was talking about?

4      A     Yes.

5      Q     The reason I asked, it never makes sense to

6   witnesses, but sometimes lawyers get into a fight about

7   what's what, and I have learned if I just ask the witness

8   what it is we just eliminate the fight.

9          Okay.  I'm sure your lawyer will object to this

10  question, but is there anything you want to add to clarify

11  or make clearer any answer you have given?

12         **MR. WAYMIRE:**  I do object.

13         **MR. DODD:**  Yeah, that's fine.

14     **A**     To clarify?

15  **BY MR. DODD:**

16     Q     Or to amplify, just to communicate better.  I have

17  gotten to the age where I realize I don't ask the right

18  questions a lot of times.  When I was younger, I thought I

19  asked all the right questions.

20     A     The question you asked about the cameras.

21     Q     Cameras, okay.

22     A     And that there was no cameras in place.

23     Q     Right.

24     A     I wanted to clarify that there are other measures

25  that besides a camera for, you know, a camera can't stop

1    something from happening.

2        Q    Okay.

3        A    And we have the person roving in the pod.  Each

4    glass window is on each pod.  And then we have got a floor

5    officer that goes cell block to cell block, you know,

6    finding out everything is okay, walking around.  He was in

7    the right spot as far as the quick response.  The pod

8    officer is the one that saw the altercation going down.

9        Everything worked like it -- I mean, it's very

10   unfortunate the outcome, but as far as our response and

11   people being alert and knowing what was happening --

12       Q    You don't have any criticism of that?

13       A    Pretty much spot on.

14       Q    Since you brought that up, let me ask a couple of

15   questions.  Where was the -- what did you call it, the

16   roving officer?

17       A    I'm not sure.  I'm not sure where he was on the

18   floor.  I just know that he made a pretty quick response.

19       Q    Pretty quick response, okay.  Is there any buttons

20   or emergency something that a prisoner could punch?

21       A    We have an intercom system.

22       Q    I was, way overengineering that, wasn't I?  Just

23   an intercom system.  Was that punched before the attack?

24       A    Not to my knowledge.

25       Q    Is there a report on that, when one is punched?

1     **A**   No.

2     **Q**   Electronic tape or anything?

3     **A**   No.  Scale it back a little bit.

4     **MR. MURRAH:**  Was he saying there was cameras

5     before?  Is that what he said?

6     **MR. DODD:**  No, I got it.

7     That's all I have.

8     (THEREUPON, the deposition was concluded at

9     2:06 p.m.  Reading and signing was not waived.)

10          *     *     *

11     **CERTIFICATE OF OATH**

12

13     STATE OF FLORIDA    )

14     COUNTY LEON       )

15     I, the undersigned authority, certify that said

16     designated witness personally appeared before me and was

17     duly sworn.

18     WITNESS my hand and official seal this 11th day

19     of August, 2006.

20

21

22

23     PATRICIA M. BREWER, CCR
          Certificate Number B-832

24

25

## CERTIFICATE OF REPORTER

STATE OF FLORIDA          )

COUNTY OF LEON            )

      I, PATRICIA M. BREWER, Certified Court Reporter, certify that the foregoing proceedings were taken before me at the time and place therein designated; that my shorthand notes were thereafter translated under my supervision; and the foregoing pages numbered 1 through 65 are a true and correct record of the aforesaid proceedings.

      I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

      DATED this 11th day of August, 2006.

_____

PATRICIA M. BREWER, CCR
Certificate Number B-832

Plaintiff's Exhibit GBI
Exhibit 7, Page 8

MEDICATION LOG

CAIRO, GEORGIA

INMATE NAME: Ricky Reynolds

PRESCRIPTION: Risperdal/Risperidone

DIRECTIONS:

DOCTOR: Bordenable 3mg 10.6

INMATE NUMBER:

| Date | Time | Bedtime Officer | Inmate | Date | Time | Bedtime Officer | Inmate | Date | Time | Bedtime Officer | Inmate |
|------|------|-----------------|--------|------|------|-----------------|--------|------|------|-----------------|--------|
| 3/23/02 | | RB | RR | 4/15 | 21:00 | | | 21:04 | | | |
| 3/24 | 21:00 | RB | RR | 4/16 | 21:00 | | | 21:04 | | | |
| 3/26 | 21:00 | RB | RR - no meds | 4/17 | 21:00 | | | 21:04 | | | |
| 3/27 | 21:00 | RB | RR | 4/18 | 21:00 | | | 21:04 | | | |
| 3/28 | 21:00 | RB | RR | 4/19 | 21:00 | | | 21:04 | | | |
| 3/29 | 21:00 | RB | RR | 4/20 | 21:00 | | | 21:04 | | | |
| 3/30 | 21:00 | RB | RR | 4/21 | 21:00 | | | 21:04 | | | |
| 3/31 | 21:00 | | RR | 4/22 | 21:00 | | | 21:04 | | | |
| | 21:00 | | | 4/23 | 21:00 | | | 21:04 | | | |
| | 21:00 | | | 4/24 | 21:00 | | | 21:04 | | | |
| | 21:00 | | KB | 4/25 | 21:00 | | | 21:04 | | | |
| | 21:00 | | KB | 4/26 | 21:00 | | | 21:04 | | | |
| | 21:00 | | KB | 4/27 | 21:00 | | | 21:04 | | | |
| 4/10 | 21:04 | | KB | | | | | 21:04 | | | |
| 4/11 | 21:04 | | KB | | | | | 21:04 | | | |
| 4/12 | 21:04 | | KB | | | | | 21:04 | | | |
| 4/13 | 21:04 | | | | | | | 21:04 | | | |
| 4/14 | 21:04 | | | | | | | 21:04 | | | |

EXHIBIT

Plaintiff's Exhibit GBI
Exhibit 7, Page 9

GRADY COUNTY JAIL
CAIRO, GEORGIA

MEDICATION LOG

INMATE NAME: Ricky Reynolds          INMATE NUMBER:

PRESCRIPTION NUMBER: 1604/619   MEDICATION: Diphenhydra—  PHARMACY: Jackson Street Pharmacy
mine

NBR REFILLS: 0      DOCTOR: Vandewalle

DIRECTIONS: 1 @ Bedtime

| | Bedtime | | | | Bedtime | | | | Bedtime | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE | PM TIME | OFFICER | INMATE | DATE | PM TIME | OFFICER | INMATE | DATE | PM TIME | OFFICER | INMATE |
| 3/23/09 | 21:00 | TT RB | RR | 4/13 | 21:00 | CL | | | 21:00 | | |
| 3/24 | 21:00 | TT RB | No meds | 4/14 | 21:00 | CL | | | 21:00 | | |
| 3/24 | 21:00 | CR | RR | 4/15 | 21:00 | | | | 21:00 | | |
| 3/27 | 21:00 | LL RB | RR | 4/16 | 21:00 | | | | 21:00 | | |
| 3/28 | 21:00 | C RB | RC | 4/17 | 21:00 | CR | | | 21:00 | | |
| 3/29 | 21:00 | C RB | RR | 4/18 | 21:00 | CL | | | 21:00 | | |
| 3/30 | 21:00 | | RR | 4/19 | 21:00 | CL | | | 21:00 | | |
| 3/31 | 21:00 | | RR | | 21:00 | | | | 21:00 | | |
| 4/1 | 21:00 | TT RB | RC ✓ | | 21:00 | | | | 21:00 | | |
| 4/2 | 21:00 | C RB | RC ✓ | | 21:00 | | | | 21:00 | | |
| 4/3 | 21:00 | CR RB | RR ✓ | | 21:00 | | | | 21:00 | | |
| 4/4 | 21:00 | CR | RB ✓ | | 21:00 | | | | 21:00 | | |
| 4/5 | 21:00 | CR | RR ✓ | | 21:00 | | | | 21:00 | | |
| 4/6 | 21:00 | CR RB | RC ✓ | | 21:00 | | | | 21:00 | | |
| 4/7 | 21:00 | CR RB | RR | | 21:00 | | | | 21:00 | | |
| 4/8 | 21:00 | | | | 21:00 | | | | 21:00 | | |
| 4/9 | 21:00 | | | | 21:00 | | | | 21:00 | | |
| 4/10 | 21:00 | | | | 21:00 | | | | 21:00 | | |
| 4/11 | 21:00 | | | | 21:00 | | | | 21:00 | | |
| 4/12 | 21:00 | | | | 21:00 | | | | 21:00 | | |

EXHIBIT