**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

| | |
|---|---|
| ANGELA HARRY, *individually* and as next of friend of J.H., *a minor*, : : : | |
| Plaintiff, : : | CASE NO.: 1:10-CV-130 (WLS) |
| v. : : | |
| TIM GAINOUS, : : | |
| Defendant. : : | |

## **ORDER**

Before the Court is Defendant Tim Gainous' Motion for Summary Judgment. (Doc. 40.) For the reasons that follow, Gainous' motion is **GRANTED**.

**I.  Procedural Background**

This lawsuit arises from the death of Wade Harry (Harry), who was attacked and killed at the Grady County Jail by another inmate. Harry's wife, Angela Harry (Plaintiff), brought suit against Tim Gainous (Gainous), the jail administrator for the Grady County Sheriff's Office, under 42 U.S.C. § 1983, alleging that Gainous, in his individual and official capacities, was deliberately indifferent to a serious risk of harm, in violation of the Fourteenth Amendment to the United States Constitution. The basic allegations are that Gainous promulgated policies that failed to properly segregate violent from nonviolent detainees and allowed detainees with mental illnesses to go without medication. Plaintiff claims that as a result of these policies, Ricky Reynolds, who has schizophrenia, lapsed into a psychotic episode and, without provocation, assaulted Harry.

1

The matter is before the Court on Gainous' motion for summary judgment. He essentially claims he is entitled to a judgment as a matter of law because Harry did not suffer a constitutional violation. Gainous argues he was not deliberately indifferent because none of his policies created an objectively serious risk of harm. Furthermore, per Gainous, nothing in the record suggests he knew of and disregarded any risk to Harry. Gainous also claims, as an arm of the state, he is entitled to sovereign immunity in his official capacity. Alternatively, he avers Plaintiff has not submitted a repeated pattern of violations to create a jury issue on municipal liability.

In response, Plaintiff claims she survives summary judgment because Harry suffered a constitutional violation at the hands of Gainous' subordinates. Gainous, in turn, is liable because he promulgated deliberately indifferent policies that led to Harry's death. She claims the medicine-refill policy at the prison was facially unconstitutional and that Gainous was deliberately indifferent in failing to train his employees to identify mental illness and for failing to create policies to better classify and monitor mentally ill detainees. Harry claims Gainous cannot escape liability because his violations were "obvious."

The briefing period has ended on Gainous' motion, and the Court now turns to the record evidence.

## II. Statement of Relevant Facts

The following facts are derived from the complaint, the answer, the statements of material facts, and the record in this case.

### A. The Attack

On August 21, 2009, inmate Ricky Reynolds attacked and killed Wade Harry at the Grady County Jail. (Doc. 56 at ¶ 2.) The assault occurred around 7:45 p.m. (*Id.* ¶ 38.)

While playing cards with three other inmates, Harry went upstairs from the downstairs dormitory to a mezzanine area with cells, apparently to get sugar and creamer for his coffee. (*Id.* ¶ 35.) When he descended back down the stairs, Reynolds was waiting for him and attacked him. (*Id.* ¶ 38.) He punched Harry in the head, and, after Harry fell to the ground, began stomping on his head. (*Id.* ¶¶ 38, 41.)

Detention officer Sean Poitevint was nearby when the attack occurred. (*Id.* ¶ 39.) He called for help and ran toward Reynolds and ordered him to stop. (*Id.* ¶¶ 40–41.) Reynolds ignored him. (*Id.*) Officer Poitevint advanced and Reynolds drew back as if to attack Poitevint. (*Id.* ¶ 42.) Reynolds then said, "You're next." (*Id.* ¶ 43.)  Other officers responded and helped restrain Reynolds. (*Id.* ¶¶ 45–46.)  EMS transported Harry to a local hospital, where he later died. Reynolds was placed in insolation for the rest of his stay at Grady County Jail. (*Id.* ¶ 47.)  A court-ordered evaluation following the attack revealed that Reynolds had paranoid schizophrenia. (*Id.* ¶ 48.)

### B. Wade Harry

Harry first arrived at the jail in July 2008, on charges of family violence battery and criminal trespass, after he allegedly punched his wife and slammed her head into a wall and smashed his daughter's car windshield. (*Id.* ¶ 14; Pl. GBI Ex. 2 at 28.) He was placed on probation and returned to the jail on a probation violation in August 2009. (Doc. 56 at ¶ 16.)

### C. Ricky Reynolds

Reynolds arrived at the jail on March 23, 2009, as a transferee from Thomas County Jail, on charges or burglary and criminal damage to property in the second degree. (*Id.* ¶¶ 17, 21.) The incident report notes Reynolds was arrested after someone threw a cement block through a Quick Buys' window and stole about $250 worth of cig-

arettes. (Pl. Ex. GB 2 at 35.) Prior to that incident, he had also been arrested more than two dozen times, mostly for property offenses such as burglary.

At Thomas County Jail, Reynolds underwent an initial intake medical exam because he arrived with medication. (Doc. 56 at ¶ 110.) Based on the initial exam, the jail took him to a mental health assessment. (*Id.* ¶ 110.) During the assessment, a psychiatrist prescribed Reynolds Risperdal and Benadryl. (*Id.* ¶ 113.) The Grady County transporting officer picked up Reynolds' medications and prescription from Thomas County and booked Reynolds with the medications Diphenhydramine and Risperidone. (*Id.* ¶ 20.) The transporting officer did not know that Reynolds had mental health medicine or a mental illness. (*Id.* ¶ 19.)

A P.O.S.T.-certified[1] officer booked Reynolds at the jail. (*Id.* ¶ 22.) During the booking process, Reynolds denied having recently seen a medical or psychiatric doctor for any illness. (*Id.* ¶ 25.) He also denied having been hospitalized recently and answered "no" when the officer asked him whether he had any medical problems jail staff should know about. (*Id.* ¶ 24, 26.) After the booking process, Reynolds was placed in general population.

Prior to the attack, Reynolds had never had a fight at Grady County Jail or an argument or fight with Wade Harry. (*Id.* ¶ 28.) To the contrary, Reynolds had a reputation among fellow inmates as being "a great guy," generally friendly and laid back. (*Id.* ¶ 27.) About a week before the incident, however, Reynolds began changing. He became standoffish, slept with his shoes on, stopped eating, and mumbled to himself as if talking to "somebody who wasn't even there." (*Id.* ¶ 127.) Reynolds allegedly told Officer

---

[1] The State of Georgia requires jail officers to complete a training course provided by the Peace Officers Standards and Training Council within six months of beginning work at a jail. O.C.G.A. § 35-8-24. This training is often called a P.O.S.T. certification.

4

Donald Thomas he wanted to be segregated so he didn't hurt anybody. (*Id.* ¶ 131.) A few hours before the incident, Officers Johnny Martin and Miriam Scott performed a head count and reported that Reynolds did not seem angry. (*Id.* ¶ 30; Pl. Ex. 36 at 1.) They also did not notice anything unusual about him during the headcount or after. (Doc. 56 ¶ 38.)

After the attack, Reynolds pleaded guilty but mentally ill.

### D. Tim Gainous

During the relevant time periods, Defendant Tim Gainous was a captain with the Grady County Sheriff's Office and the chief administrator of the Grady County Jail. (*Id.* ¶ 3.) He has held that position since 2005. (*Id.*) In this position, Gainous primarily oversees the administration of the jail and establishes policies and procedures for the jail and its officers. (*Id.* ¶ 6.) Prior to the attack, Gainous did not personally deal with Reynolds or Harry and he did not know anything about Reynolds' medication. (*Id.* ¶ 7.) He did not know anything about either inmate before the attack. (*Id.* ¶ 9.) Gainous' normal work schedule is 8 a.m. to 5 p.m. (*Id.* ¶ 8.) He was not present in the jail during the attack, which occurred around 7:45 p.m. (*Id.* ¶ 11.)

### E. Inmate Medications

When inmates arrive at the jail with medication, the booking officer gives the medicine to the officer responsible for dispensing it. (*Id.* ¶ 51.) During Reynolds' incarceration at Grady County Jail, P.O.S.T.-certified officers Stephanie Clayton and Sandra Green kept track of medication. (*Id.* ¶¶ 52–53.) Officers regularly dispensed Reynolds his medicine until it ran out in April 2009. (*Id.* ¶ 55.) If a prescription calls for a refill, an officer can obtain the refill from a local drug store. (*Id.* ¶ 57.) Reynolds' prescription, however, did not call for a refill. (*Id.* ¶ 58.) When a prescription does not have a refill, an

officer asks the inmate whether the medication needs a refill and, if the inmate says yes, the officer refers the inmate a doctor. (Doc. 55 at 19, 51–52.) Jail officials are required to follow the directions on the prescription label regarding when and how to dispense medication. (*Id.* ¶ 71.)

The Sheriff's Office budget contains a line item for inmate medications, which generally exceed the budgeted amount. (*Id.* ¶ 65, 67.) The County ultimately provides funds to cover medication. (*Id.* ¶ 65.)

Although the parties disagree about whether Reynolds did in fact request additional medication, there is no dispute that no one informed Gainous whether Reynolds requested a refill. (*Id.* ¶ 62.) It is undisputed Reynolds told Officer Green, who handled the medications, that he did not need a refill. Furthermore, Gainous did not know why Reynolds was taking medication or that it had run out. (*Id.* ¶ 64.) He also did not know whether Risperidone was a medication that typically needed a refill. (*Id.* ¶ 69.)

**F. Booking procedure**

Grady County Jail uses a computer system to classify and book inmates. (*Id.* ¶ 75.) In 2009, the computer system prompted detention officers to ask inmates a series of questions prior to booking. (*Id.* ¶ 76.) By default, inmates are placed in general population. (*Id.* ¶ 81.) If they exhibit aggressiveness or have a history of fighting inmates or officers, among other criteria, the booking officer may place the inmate in segregation. (*Id.* ¶ 77.) Booking officer do not do independent background checks on inmates. (*Id.*) Rather, they are segregated only if it is obvious that the inmate poses a special threat or if they offer the information during the booking process. (*Id.*) On the other hand, if an inmate is charged with murder or a similarly violent crime, that inmate will be segregated away from general population. (*Id.* ¶ 78.)

Based on the booking paperwork, Reynolds was not viewed as a risk for violence or misconduct and was therefore placed in general population.

### G. Officer Training

On August 21, 2009, at the time of the incident, Sergeant Tito Hall was the on-duty shift sergeant. (*Id.* ¶ 85.) That night he supervised detention officers Mahalia Moore, Johnny Martin, Miriam Scott, and Tim Poitevint. (*Id.* ¶ 86.) Hall is an eight-year veteran at the Grady County Jail. (*Id.* ¶ 87.)  Moore is a ten-year veteran. (*Id.* ¶ 88.) Hall, Scott, and Moore were all P.O.S.T-certified jailers under Georgia law. (*Id.* ¶ 89.) P.O.S.T. training includes information on identifying mentally ill detainees. (*Id.* ¶ 148.) As new employees, Officers Martin and Poitevint were in a six-month probationary period and completed their certification after the incident. (*Id.* ¶ 90.) New detention officers follow a more senior officer around the jail for training before they receive a P.O.S.T certificate. (Doc. 54 at 7; Doc. 58 at 20–21; Doc. 50 at 42–44.)

### H. Inmate Supervision

Around the time of the attack, at least four detention officers ordinarily worked on a twelve-hour shift to supervise the inmates. (Doc. 56 at ¶ 92.) At least one sergeant oversees the officers.  (*Id.* ¶ 93.) In Harry's dormitory, one officer is stationed in an observation post to monitor inmates. (*Id.* ¶ 94.) At the same time, a "floor officer" and the shift supervisor walk around the dormitory to monitor inmates. (*Id.* ¶ 95.) Inmates can also communicate with officers through an intercom system. (*Id.* ¶¶ 96, 97.)  At the time of the attack, the jail did not have surveillance cameras in Harry's dormitory. (*Id.* ¶ 98.)

Prior to the attack, Gainous had not received any information that Reynolds had threatened or attacked another inmate. (*Id.* ¶ 99.)  He also had not received information

7

that physical attacks were a usual occurrence in the jail or in the Harry's housing unit. (*Id.* ¶ 100.)

### III. DISCUSSION

#### A. Summary Judgment Standards

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir. 1990). A fact is "material" if it is a legal element of the claim under the applicable substantive law and it might affect the outcome of the nonmoving party's case. *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). A judgment is appropriate "as a matter of law" when the nonmoving party has failed to meet its burden of persuading the Court on an essential element of the claim. See *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 804 (1999); *Celotex Corp.*, 477 U.S. at 323.

The movant bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing, or by pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue

8

for trial." *Id.* at 324. To avoid summary judgment, the nonmoving party must do more than summarily deny the allegations or "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party must provide "enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 251 (1986)).

On a motion for summary judgment, the Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *Celotex Corp.*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

### B. Gainous' Notice of Objection

As a preliminary matter, Gainous objects to Plaintiff's proffers of expert testimony from Jennifer Meyer and G.M. Malone. Jennifer Meyer is a psychologist who performed a court-ordered forensic psychological exam on Reynolds to determine whether he was competent to stand trial. Although the Court is unable to find G.M. Malone's report in the record, Plaintiff apparently offers him to opine about the deficiency of various policies at the Grady County Jail.

Gainous claims Plaintiff failed to timely provide full expert disclosures by October 1, 2011, the deadline in the Court's scheduling and discovery order. In support of this claim, Gainous attaches an e-mail from Plaintiff's counsel providing an expert disclosure in January 2013. Gainous also notes that he has never received an expert report for Meyer and her competency evaluation does not qualify as one.

The Court agrees with Gainous that Plaintiff was required to produce expert reports. Federal Rule of Civil Procedure 26(a)(2)(B) requires parties to provide expert reports along with their disclosures "if the witness is one retained or specially employed to provide expert testimony." Fed. R. Civ. P. 26(a)(2)(B). As an initial matter, Meyer did not have any direct, personal knowledge of the events leading up to the attack. She instead reviewed incident reports, medical records, and took facts from her interview with Reynolds. She reviewed these materials at a court's request, solely for a court proceeding. Thus, she "functioned exactly as an expert witness normally does, providing a technical evaluation of evidence [she] had reviewed in preparation for trial." *Prieto v. Malgor*, 361 F.3d 1313, 1319 (11th Cir. 2004). Her psychological examination does not qualify as an expert report under Federal Rule of Civil Procedure 26(a)(2)(B), because it does not contain the required information. Moreover, because the competency report deals with a legal issue primarily unrelated to the present one, defense counsel was never put on notice as to the content of her proffered testimony. Likewise, G.M. Malone does not purport to have any personal knowledge of Grady County Jail.

Additionally, Plaintiff also offers in opposition to summary judgment various factual statements in Meyer's report. These statements are rank hearsay. In general, inadmissible hearsay cannot be considered on a motion for summary judgment. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)). "Nevertheless, 'a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Id.* at 1293–94 (quoting *Macuba*, 193 F.3d at 1323). Even if Meyer's report could be reduced to admissible form, the statements and records within that report are double-hearsay

not within any exception to the hearsay rule. *See Goodman v. Kimbrough*, 718 F.3d 1325, 1333 n.2 (11th Cir. 2013).

Plaintiff has made no argument or showing the statements could be reduced to admissible form. And, in fact, much of the hearsay evidence regarding Reynolds' mental health history on which Plaintiff relies appears to be gleaned from Reynolds' mental-health records—records that Plaintiff failed to timely obtain. (*See* Doc. 37.) Another statement—"Reynolds said he asked jail officers for his medication but they advised him that they did not have any medication for him"—is contradicted by reducible testimony that Reynolds in fact told a detention officer that he did not need additional refills. *See Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996) (noting that nothing indicated inadmissible hearsay statements could not be reduced to admissible form because the "statements were refuted by [defendant's] evidence . . . which can be reduced to admissible form at trial"). Thus, there is no indication—and Plaintiff does not claim there is one—that the statements could be reduced to admissible form at trial.

In summary, Plaintiff has not offered a response or excuse to show the failure to timely disclose the expert reports was substantially justified or harmless. She has also not made any attempt to show the double-hearsay in Meyer's report could be reduced to admissible form. Accordingly, any evidence in G.M. Malone's and Meyer's reports are **STRICKEN** from the record.[2]

**C. Analysis**

**i. Claims against Gainous in his individual capacity**

---

[2] But even if the reports were admissible, Gainous would still be entitled to summary judgment because there is no evidence he acted deliberately indifferent to a serious risk of harm. It is undisputed Gainous knew nothing about the information in Meyer's report or about a need to do anything different than the policies already in place at the jail.

The Due Process Clause of the Fourteenth Amendment prohibits prison officials from acting deliberately indifferent to a known, substantial risk of serious harm to pretrial detainees. *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003)). Prison officials have a duty to protect detainees from dangerous inmates. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id.*

Rather, to survive summary judgment on such a claim, the plaintiff generally must produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation. *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) (quoting *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995)). On the second prong, the plaintiff must show that a defendant was both aware of facts giving rise to an inference that a substantial harm exists, and he must have drawn that inference. *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008) (quoting *Farmer*, 511 U.S. at 837). For deliberate indifference claims, the rights under the Fourteenth Amendment are coextensive with those under the Eight Amendment. *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007) (citation omitted)[3]

Furthermore, under 42 U.S.C. § 1983, supervisors cannot be liable for the unconstitutional acts of their subordinates under theories of respondeat superior or vicarious liability. *Cottone*, 326 F.3d at 1360. Instead, the plaintiff must establish that the supervisory official personally participated in the constitutional violation or that there exists a

---

[3] The Fourteenth Amendment applies to pretrial detainees, while the Eighth Amendment applies to those convicted of crimes.

causal connection between the actions of the supervisor and the constitutional violation. *Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013) (quoting *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010)). A causal connection may be established when (1) a history of widespread abuse puts the supervisor on notice of the need to correct a violation, and he or she fails to do so; (2) the supervisor's custom or policy results in a deliberate indifference to constitutional rights; or (3) the supervisor directed subordinates to act unlawfully or knew they would act unlawfully and failed to stop them from doing so. *Mathews v. Crosby*, 480 F.3d 1265, 1269 (11th Cir. 2007) (citing *Cottone*, 326 F.3d at 1360).

In this case, there is no evidence to support a claim that Gainous personally participated in booking Reynolds, classifying him, deciding to segregate him, or in handling his medication. Instead, Plaintiff claims Gainous is liable in a supervisory capacity for unconstitutional policies and training at the prison. She argues in particular that the prison medicine refill policy was a "de facto denial of adequate medical care"; that the prison's procedure for booking or classifying inmates was constitutionally inadequate; and that Gainous was deliberately indifferent for his failure to train subordinates.

Plaintiff has failed to create a triable issue of fact on any of these grounds. Without more, supervisors cannot be liable for merely implementing facially constitutional policies. *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1036 (11th Cir. 2001). For a supervisor to be liable for deliberate indifference on a facially constitutional policy, he or she must ordinarily have notice of a flagrant, persistent pattern of violations. *Id. Cf. Goodman v. Kimbrough*, 718 F.3d 1325, 1335 (11th Cir. 2013). There is nothing in the record to suggest Gainous knew his policies posed a substantial risk of serious harm to

inmates. Plaintiff has not identified a single incident of violence predating Reynolds' attack.

Having failed to unearth any evidence Gainous had knowledge of a danger to Harry or other detainees, Plaintiff makes the extraordinary claim that the prison policies were facially unconstitutional. A procedure or policy is facially unconstitutional when "no set of circumstances exists under which the [policy] would be valid." *Lynch v. Jackson*, 478 F. App'x 613, 617 (11th Cir. 2012) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). It is difficult to understand how Grady County Jail's policy of strictly following a doctor's prescription for medication is facially unconstitutional.[4] It is also difficult to understand how refilling medicine as a doctor prescribes or at inmate request is, as Plaintiff claims, a "de facto denial of adequate medical care." Plaintiff provides no authority for such a claim.

But even if the prescription-refill policy was unconstitutional in a general way, Plaintiff has failed to establish a causal link between that policy and Reynolds' assault. To make that connection, Plaintiff needed to provide evidence that (1) a doctor would have prescribed Reynolds more medication; (2) that Reynolds would have voluntarily taken the medication, or that, if he refused to take it, a court would have ordered involuntary medication; and (3) that Reynolds would not have attacked Harry if he was on the medication. Harry did not submit admissible evidence to support such a tenuous string of inferences. It is an exceedingly dubious premise that the jail could have required Reynolds to take medication after he declined a refill. An inmate cannot be involuntarily medicated against his will unless he is dangerous to himself or others.

---

[4] In fact, Reynolds underwent a psychiatric assessment just before his transfer to Grady County Jail. It would not be deliberately indifferent to dole Reynolds medication exactly how that doctor prescribed.

14

*Washington v. Harper*, 494 U.S. 210, 227 (1990). Reynolds never exhibited any dangerous behavior prior to the assault, and, even during his alleged psychosis, he was merely "standoffish" and mumbled to himself.

Harry also claims Gainous is liable for failing to establish "a policy or procedure for intake examinations, identifying mental illness, running computer-based information checks, obtaining inmate medical records, identifying health screening questions, or checking on the purpose of an inmate's prescription medication." Again, there is no evidence Gainous knew of a need to establish a policy for these things or that he was otherwise on notice something more was required. Harry has also failed to show that these particular policies were constitutionally required over the existing booking and intake procedures at Grady County Jail. Given that Gainous did not have knowledge of recurring incidences at the jail, there is no evidence Gainous knew that his policy created a serious risk of harm (assuming there even was a serious risk of harm).

Finally, there is insufficient evidence to hold Gainous liable for a failure to train. To hold a supervisor liable for a failure to train, the supervisor must have notice of a need to train in a particular area. *Gold v. City of Miami*, 151 F.3d 1346, 1351–52 (11th Cir. 1998). The failure to train, in other words, must amount to a deliberate indifference. *Id.* at 1350–52. Harry has failed to submit evidence that Gainous knew of a need to further train detention officers to identify mental illness. It is not obvious that detention officers should be able to identify particular mental illnesses and the uses of psychotropic drugs. Moreover, the P.O.S.T. training included instruction on how to generally identify mental illness. All of the detention officers at Grady County Jail were required to complete P.O.S.T. training within six months of employment and were monitored by a P.O.S.T.-certified sergeant.

For those reasons, Harry has failed to show that Gainous, in his individual capacity, acted deliberately indifferent to a serious risk of harm.

### ii. Claims against Gainous in his official capacity

Plaintiff's claims against Gainous in his official capacity are equally unavailing. To establish a claim against Gainous in his official capacity, Plaintiff must show Harry suffered a constitutional violation as a result of "(1) an action taken or policy made by an official responsible for making final policy in that area of the [entity's] business; or (2) a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." *Goodman*, 718 F.3d at 1335 (quoting *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995)). "[Eleventh Circuit] decisions establish that supervisory liability for deliberate indifference based on the implementation of a facially constitutional policy requires the plaintiff to show that the defendant had actual or constructive notice of a flagrant, persistent pattern of violations." *Goebert v. Lee County*, 510 F.3d 1312, 1332 (11th Cir. 2007) (citations omitted). Thus, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability" against a public entity. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985).

As a preliminary matter, as previously discussed, Gainous' policies were not facially unconstitutional. Plaintiff has not presented any evidence or authority to suggest that following a doctor's prescription or refilling medications at an inmate's request is, on its face, an unconstitutional practice. There is similarly no authority suggesting that the existing policies for intake and booking were facially unconstitutional.

Nor has Plaintiff presented any evidence to support an inference that Gainous or his employer had notice that the policies were insufficient to protect detainees from a serious risk of harm. Plaintiff has not pointed to a single incidence of violence at the

16

Grady County Jail. Thus, Plaintiff has failed to establish that Gainous, in his official capacity, was deliberately indifferent to a serious risk of harm. No material issue of fact remains.

## IV. CONCLUSION

For the foregoing reasons, Gainous' Motion for Summary Judgment (Doc. 40) is **GRANTED**. It is hereby **ORDERED** and **ADJUDGED** that Plaintiff shall take nothing by her complaint and that judgment shall be entered in favor of the defendant.

**SO ORDERED**, this   27th   day of September 2013.

                                          /s/ W. Louis Sands
                                        **THE HONORABLE W. LOUIS SANDS,**
                                        **UNITED STATES DISTRICT COURT**